**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ROGER P. JACKSON, M.D.,

     Plaintiff,

     v.

HIGHRIDGE MEDICAL LLC,

     Defendant.

Civil Action No. 22-891-RGA

## MEMORANDUM OPINION

Stephen J. Kraftschik, POLSINELLI PC, Wilmington, DE; Thomas Gemmell, Mark T. Deming, POLSINELLI PC, Chicago, IL; Aaron M. Levine, POLSINELLI PC, Houston, TX, Darren E. Donnelly (argued), POLSINELLI PC, San Francisco, CA,

     Attorney for Plaintiff.

Thatcher A. Rahmeier, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, DE; Kevin P. Wagner (argued), Lauren J.F. Barta, Doowon Chung, FAEGRE DRINKER BIDDLE & REATH LLP, Minneapolis, MN,

     Attorneys for Defendant.

March 25, 2026

1



ANDREWS, U.S. DISTRICT JUDGE:

Before me is Defendant Highridge Medical's partial motion to dismiss Plaintiff Roger P. Jackson, M.D.'s second amended complaint. (D.I. 42). Highridge's partial motion to dismiss seeks to dismiss Dr. Jackson's infringement claims asserting U.S. Patent Numbers 9,662,143 (the "'143 patent"), 9,999,452 (the "'452 patent"), 10,064,660 (the "'660 patent"), 10,898,233 (the "'233 patent"), 11,045,229 (the "'229 patent"), and 11,134,993 (the "'993 patent"). (D.I. 42 at 1). I have reviewed the parties' briefing (D.I. 43, 49, 55) and I heard oral argument on March 10, 2026. At the oral argument, I denied Highridge's motion to dismiss the infringement claims related to the '452, '660, and '233 patents. For the reasons set forth below, Highridge's motion to dismiss is granted for the infringement claims related to the '143, '229, and '993 patents.

## I.    BACKGROUND

In the second amended complaint, Dr. Jackson sued Highridge[1] for infringement of thirteen patents by two of Highridge's products—the Vitality Spinal Fixation System and the Vital Spinal Fixation System. (D.I. 39). Highridge responded with the pending partial motion to dismiss. (D.I. 42). In its partial motion to dismiss, Highridge argues that Dr. Jackson is not the owner nor exclusive licensee of six of the thirteen asserted patents. (Id. at 1). Highridge argues that the rights to the '143, '452, '660, '233, '229, and '993 patents were assigned to NuVasive, Inc. ("NuVasive") as part of the "Top Notch IP" identified in a 2014 agreement (the "2014 Agreement") between Dr. Jackson and NuVasive. (Id.). Highridge argues that the 2014 Agreement should be read as an assignment that transferred all ownership rights, and therefore standing, to NuVasive. (Id. at 4).

---

[1] Dr. Jackson originally filed this suit against Defendant ZimVie, Inc. (D.I. 1 at 1). Defendant ZimVie was substituted with its wholly owned subsidiary Zimmer Biomet Spine, LLC. (D.I. 23). After Zimmer Biomet Spine changed its name to Highridge Medical, LLC, the parties stipulated to updating the case caption to reflect the new name. (D.I. 47).

2

According to the 2014 Agreement, the Top Notch IP covers "the horizontal tool attachment feature" claimed in U.S. Patent Numbers 8,377,067 (the "'067 patent") and 8,162,948 (the "'948 patent"), and U.S Patent Application Numbers 11/272,508 (the "'508 application") (now U.S. Patent Number 9,050,148) and 13/815,054 (the "'054 application") (now U.S. Patent Number 8,900,272). (*Id.* at 1–2). The patents that Highridge seeks to dismiss were issued after the 2014 Agreement. (*Id.* at 4). Highridge argues that the '143, '229, and '993 patents descend from and claim priority to the '054 application. (*Id.*).[2]

Dr. Jackson responds by arguing that the 2014 Agreement should be interpreted as a license agreement, not as an assignment. (D.I. 49 at 9–12). To make this argument, Dr. Jackson references two prior cases that he brought against other defendants. (*Id.* at 13–15) (citing *Jackson v. NuVasive, Inc.*, case no. 1:21-cv-53 (D. Del.); *Jackson v. SeaSpine Holdings Corp.*, case no. 1:20-cv-1784 (D. Del.)). Dr. Jackson argues that I properly interpreted the 2014 Agreement in the *NuVasive* case such that the agreement did not include all technologies covered in the listed patents, but rather only covered the specific technologies recited in the agreement. (*Id.* at 14). Dr. Jackson argues that this interpretation is proper based on Missouri contract law and principles of patent law that prevent the assignment of some but not all of a patent. (*Id.* at 14–16). In making this argument, Dr. Jackson argues that the 2014 Agreement was not self-executing and was

---

[2] The '452, '660, and '233 patents do not claim priority from the patents specified as part of the Top Notch IP. Highridge argued that the 2014 Agreement is an assignment of the horizontal tool feature generally and the stated patents merely serve as examples of the horizontal tool feature. (D.I. 42 at 3). Highridge argued that '452, '660, and '233 patents all include the horizontal tool feature, and thus, are included in the 2014 Agreement as part of the Top Notch IP that was transferred to NuVasive. (*Id.*). As explained in my ruling during oral argument, Highridge's motion to dismiss these patents requires factual determinations that cannot be made at this stage. Without these factual determinations in favor of Highridge, Dr. Jackson has met his pleading burden under Rules 12(b)(1) and 12(b)(6). Highridge made similar arguments that the '143, '229, and '993 patents contain identical figures to those contained in two of the patents identified in the 2014 Agreement. I do not address these arguments for similar reasons.

amended by a later executed Schedule 2.01, and thus, must be interpreted based on the later agreed terms. (*Id.* at 12–13). These later agreed terms, Dr. Jackson argues, limited the license to the specified patents and removed rights for the '054 application (the '272 patent). (*Id.* at 10–11). Dr. Jackson argues that his previous *NuVasive* case confirmed he is the owner of the patents. (*Id.* at 17). If the 2014 Agreement is determined to be an assignment of entire patent rights, Dr. Jackson argues that even if the Court agrees with Highridge's interpretation of the 2014 Agreement, the Agreement would not apply to the '143, '229, and '993 patents. (*Id.* at 18–20).

## II.  LEGAL STANDARD

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits the dismissal of a claim for "lack of subject matter jurisdiction." "Article III standing is a jurisdictional requirement, which is incurable if absent at the initiation of suit." *Intell. Tech. LLC v. Zebra Techs. Corp.*, 101 F.4th 807, 814 (Fed. Cir. 2024). To establish constitutional standing, a plaintiff must show that (1) he has suffered a concrete and particularized injury in fact that is actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In patent cases, "the question for the injury-in-fact threshold is whether a party has an exclusionary right." *Intell. Tech.*, 101 F.4th at 814. "[W]hether a party possesses all substantial rights in a patent does not implicate . . . subject-matter jurisdiction." *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235–36 (Fed. Cir. 2019).

A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. *Constitution Party v. Aichele*, 757 F.3d 347, 357–58 (3d Cir. 2014). "In reviewing a facial attack, 'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'"

4

*Id.* at 358 (quoting *In re Schering Plough Corp.*, 678 F.3d 235, 243 (3d Cir. 2012)). This requirement is met in patent cases "[a]s long as a plaintiff alleges facts that support an arguable case or controversy under the Patent Act." *Schwendimann v. Arkwright Adv. Coating, Inc.*, 959 F.3d 1065, 1071 (Fed. Cir. 2020). In reviewing a factual attack, the court may consider evidence outside the pleadings. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). "Under [the Patent Act], only a 'patentee' is permitted to pursue a patent infringement action." *Schwendimann*, 959 F.3d at 1072. "The term patentee includes the original patentee (whether the inventor or original assignee) and 'successors in title.' 35 U.S.C. § 100(d). But it does not include mere licensees." *Lone Star Silicon Innovations*, 925 F.3d at 1229.

The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Bell Atl. Corp.*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant

5

is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (internal quotation marks omitted).

## III.  DISCUSSION

Highridge argues that Dr. Jackson lacks standing[3] to bring infringement actions for six of the accused patents because the patents were assigned to NuVasive according to the 2014 Agreement. (D.I. 43 at 8–20).  Highridge argues that Dr. Jackson's infringement claims on these six patents should be dismissed under Federal Rule of Civil Procedure 12(b)(1) because Dr. Jackson does not possess any exclusionary rights over the six patents.  Highridge also argues the claims should be dismissed according to Rule 12(b)(6) because Dr. Jackson does not have all substantial rights over the six patents and therefore is not the correct party to receive relief under the Patent Act. (*Id.* at 17–20).  Both of Highridge's arguments are based on the transfer of rights in the 2014 Agreement.

### A.  Interpretation of the 2014 Agreement

The parties raise multiple disputes regarding the 2014 Agreement.  These include whether the Agreement is an automatic transfer of rights, whether the Agreement is ambiguous or incomplete, and whether the Agreement provides a license or an assignment.

### 1. The 2014 Agreement is an Automatic Transfer of Rights

---

[3] Highridge uses the term "standing" to refer to both jurisdictional and statutory standing arguments.  The Federal Circuit has acknowledged that "the § 281 inquiry" was "sometimes called statutory standing in our cases, particularly before *Lexmark*." *Intell. Tech.*, 101 F.4th at 814.  To avoid conflating the issues, I refer to Highridge's constitutional standing argument as "the subject matter jurisdiction" argument and Highridge's statutory standing argument as its "failure to state a claim" argument.

As "the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases," the Federal Circuit has "treated it as a matter of federal law." *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008). Contracts which automatically assign rights in a patent are distinguished from those "that merely obligate the inventor to grant rights in the future." *Id.* Contracts which contain language such as "will assign and do hereby assign," *Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 583 F.3d 832, 842 (Fed. Cir. 2009), "agrees to and does hereby grant and assign," *DDB Techs.*, 517 F.3d at 1290, "hereby conveys, transfers and assigns," *Speedplay, Inc. v. Bebop*, 211 F.3d 1245, 1253 (Fed. Cir. 2000), and "agrees to grant and does hereby grant," *Filmtec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1570, 1573 (Fed. Cir. 1991), have been interpreted as an automatic assignment of rights in a patent. Contracts using language such as "shall, or shall cause . . . transfer," *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1365 (Fed. Cir. 2010), "agree to assign," *IpVenture Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324, 1326 (Fed. Cir. 2007), "will be assigned," *Arachnid, Inc. v. Merit Indus.*, 939 F.2d 1574, 1580–81 (Fed. Cir. 1991), have been interpreted as an agreement for future assignment of patent rights.

The relevant portion of the 2014 Agreement states, "The Jackson Group hereby sells and assigns to NuVasive the entire right, title and interest in and to the . . . Top Notch IP pursuant to the terms of the Patent Assignment attached hereto as Schedule 2.01." (D.I. 44-1, Ex. A at 4). The phrase "hereby sells and assigns" closely aligns with contracts the Federal Circuit has determined to be an automatic transfer. *See Bd. of Trs. of the Leland Stanford Junior Univ.*, 583 F.3d at 842; *DDB Techs.*, 517 F.3d at 1290; *Speedplay*, 211 F.3d at 1253; *Filmtec Corp.*, 939 F.2d at 1570. There is nothing in this section that indicates it is simply an agreement for future action. *See*

7

*IpVenture*, 503 F.3d at 1326. Nor is there anything that indicates a future action is required before the transfer of rights occurs. *See Abraxis Bioscience*, 625 F.3d at 1365; *Arachnid*, 939 F.2d at 1580–81.

Dr. Jackson argues that the 2014 Agreement does not automatically assign any rights because the Agreement specifies that the transfer is to occur "pursuant to the terms of the Patent Assignment attached hereto as Schedule 2.01," but the Schedule 2.01 included in the Agreement was blank. (D.I. 49 at 15). This is not a case where the initial agreement outlines a future, separate document that is necessary for the Agreement to take effect. *See Abraxis Bioscience*, 625 F.3d at 1365. The 2014 Agreement explains that it is a complete agreement. (D.I. 44-1, Ex. A at 12). The Agreement, among other purposes, specifies that Top Notch IP, a term defined in the contract (*id.* at 4), is transferred. There is nothing else required for the transfer to take effect. Thus, "pursuant to" in this context is best understood as allowing for additional guidance for how the transfer shall occur. The inclusion of the blank Schedule 2.01 in the signed contract (*see* D.I. 44-1, at p. 16 of 86) indicates that there were no additional conditions for the transfer of rights to occur. Thus, the blank Schedule 2.01 has no impact on whether the Agreement is an automatic transfer of the patent rights specified within the Agreement.

### 2. The 2014 Agreement was an Assignment of the '143, '229, and '993 Patents

Traditional contract interpretation is used to determine what patent rights were transferred. *Enovsys LLC v. Nextel Communs., Inc.*, 614 F.3d 1333, 1341 (Fed. Cir. 2010). I must first decide which state law to apply. *Id.* at 1342; *Schwendimann*, 959 F.3d at 1072. The 2014 Agreement contains a choice of law provision that states, "This Agreement shall be subject to, governed by, and construed according to the laws of the State of Missouri without regard to its conflict of laws provisions." (D.I. 44-1, Ex. A at 12). Therefore, I will apply Missouri law in interpreting the

contract. Under Missouri law, a court must first determine whether a contract is ambiguous. *Sligo, Inc. v. Nevois*, 84 F.3d 1014, 1019 (8th Cir. 1996). "If no ambiguity exists, the court must construe and enforce the contract according to its plain meaning." *Id.* "The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and give effect to that intention." *Lafarge N. Am., Inc. v. Discovery Grp. L.L.C.*, 574 F.3d 973, 979 (8th Cir. 2009) (citation omitted).

### a. The 2014 Agreement is Interpreted Without Other Documents

Under Missouri law, contract interpretation begins with analyzing whether the contract is ambiguous. *Lafarge*, 574 F.3d at 979. "A contract is ambiguous if its terms are susceptible to honest and fair differences." *Knob Noster R-VIII Sch. Dist. v. Dankenbring*, 220 S.W.3d 809, 816 (Mo. Ct. App. 2007). "Where a contract consists of multiple documents, all of the documents must be read together in an effort to capture what was intended." *Id.* (internal quotation omitted). In determining whether a contract is ambiguous, the Court must "consider the document as a whole" and "avoid an effect that renders other terms and provisions meaningless." *Pelopidas, LLC v. Keller*, 633 S.W.3d 383, 395 (Mo. Ct. App. 2021) (internal quotations omitted). "If the contract is unambiguous, then the intent of the parties is to be gathered from the contract alone." *Lafarge*, 574 F.3d at 979.

In the briefing, the parties do not directly dispute whether the 2014 Agreement is ambiguous.[4] Instead, the parties argue whether the 2014 Agreement should be interpreted by itself or alongside outside documents, and whether the outside documents are either later executed

---

[4] At oral argument, Defendant took the position that the contract was not ambiguous. (Tr. 22:15–23:17, 26:21–22, 30:3–20). Plaintiff gave various inconsistent responses about whether the contract was ambiguous. (Tr. 19:10–22:14, 23:21–26:18, 28:3–9, 31:20–33:12).

portions of the agreement or extrinsic evidence. I must address this dispute first to determine what documents are a part of the contract and if it is appropriate to consider extrinsic evidence.

### i. The 2014 Agreement is Complete

Dr. Jackson argues that the 2014 Agreement is not complete and must be interpreted with later executed documents because Schedule 2.01 is blank. (D.I. 49 at 10–13). As support, Dr. Jackson points to Article X of the 2014 Agreement to argue that the parties intended to further refine the meaning of the agreement. (*Id.* at 10–13, 15). Article X of the 2014 Agreement states: "Each party signatory hereto agrees to execute such further papers or documents or agreements as may be necessary or desirable to [e]ffect the purposes of this Agreement and carry out its provisions." (D.I. 44-1, Ex. A at 11).

Highridge argues that, according to Article XII of the agreement, the 2014 Agreement "constitutes the entire Agreement between the parties respecting the terms contained herein." (D.I. 43 at 6 (citing D.I. 44-1, Ex. A at 12)). Article XII states, "No variations or modifications of the terms of this Agreement, or any waiver of any of the terms or provisions hereof, shall be deemed valid unless in writing and signed by the parties signatory hereto." (D.I. 44-1, Ex. A at 12). Highridge argues that both the 2018 Schedule 2.01 and the 2020 Schedule 2.01 are unsigned (D.I. 44-7, Ex. G; D.I. 50-1, Ex. 8) and therefore are not amendments to the Agreement because they did not follow the procedure outlined in Article XII. (D.I. 43 at 6).

I have already determined that the 2014 Agreement is an automatic transfer of patent rights regardless of the blank Schedule 2.01. This finding is consistent with the rest of the 2014 Agreement as interpreted according to Missouri law.

Articles X and XII of the 2014 Agreement are relevant in determining whether the Agreement is the complete and entire contract or if the agreement includes additional documents

10

or amendments. Article XII states the document is the "entire Agreement" and that any changes must be "in writing and signed by the parties." (D.I. 44-1, Ex. A at 12). While Article X compels the parties to create additional documents or agreements to "[e]ffect the purpose of [the 2014] Agreement" (*id.* at 11), nothing in Article X overrides the completeness or amendment procedure outlined in Article XII. Since the 2018 Schedule 2.01 and the 2020 Schedule 2.01s are not fully signed, I conclude that they are not part of the 2014 Agreement.

Interpreting the 2014 Agreement as complete aligns with Missouri law by ensuring that no portion of the agreement is left contradicted or meaningless. *Pelopidas*, 633 S.W.3d at 395. The purpose of the 2014 Agreement is to transfer certain patent rights from Dr. Jackson to NuVasive. The 2014 Agreement alone fulfills this purpose. As Article X's requirement to create additional documents or amendments is only applicable to "[e]ffect the purpose of [the 2014] Agreement" (D.I. 44-1, Ex. A at 11), nothing about this interpretation is inconsistent with Article X. Without the need for an unsigned amendment, there is no conflict between Article X's obligation and Article XII's amendment procedure. To the contrary, if the 2018 Schedule 2.01 and the 2020 Schedule 2.01 were determined to be valid amendments, it would leave both the completeness and amendment provisions of Article XII meaningless. Thus, I find that the 2014 Agreement is a contract in its entirety.

### ii. The 2014 Agreement is Unambiguous

Dr. Jackson's argument suggests that the 2014 Agreement is ambiguous because a portion of the Agreement directs the ownership rights to be assigned "pursuant to" Schedule 2.01, but the schedule is blank. (D.I. 49 at 10, citing D.I. 44-1, Ex. A at 4). Although I have already found that the blank Schedule 2.01 does not impact the automatic transfer of patent rights, I analyze the blank

11

Schedule 2.01's effect on the complete 2014 Agreement under Missouri law to determine if the use of extrinsic evidence is appropriate.

Missouri law directs the agreement to be read as a whole to determine if it is ambiguous. *Knob Noster R-VIII Sch. Dist.*, 220 S.W.3d at 816. When reading the 2014 Agreement as a whole, the Agreement sets out the parties, the rights to be transferred, and the conditions surrounding the transfer. Since the Agreement provides that it is the complete contract, and a blank Schedule 2.01 was included in the complete Agreement, it can be inferred that the inclusion of the blank Schedule 2.01 demonstrated the parties' intent to transfer rights based on the Agreement without further clarification provided in Schedule 2.01. As addressed above, this interpretation is the only way that the contract is interpreted without rendering provisions meaningless, redundant, or contradictory. Other than the dispute surrounding Schedule 2.01, the parties have not even hinted that the 2014 Agreement is ambiguous when read as a whole. Therefore, I do not consider extrinsic evidence, including the 2018 Schedule 2.01 and the 2020 Schedule 2.01, for purposes of contract interpretation. *Lafarge*, 574 F.3d at 979.

### b. The 2014 Agreement is an Assignment

Dr. Jackson argues that I should use the same logic to interpret the 2014 Agreement that I used to interpret the Agreement in the *NuVasive* case. (D.I. 49 at 13–14). Accordingly, Dr. Jackson argues that the 2014 Agreement clearly indicates the parties' intent to create a license because the Agreement focused on transferring the rights to particular technologies, including the Top Notch IP, that were contained in parts of overlapping patents. (D.I. 49 at 14).

Highridge presents various reasons why I should interpret the contract differently. (D.I. 43 at 15–17). Highridge argues that the 2014 Agreement is an assignment because it uses language that indicates a present transfer of rights and uses the word "assignment" to describe the agreement.

12

(D.I. 43 at 8). Because a patent assignment transfers entire patents and not portions of patents, Highridge argues that the 2014 Agreement transferred the patent containing the Top Notch IP in their entirety to NuVasive. (*Id.* at 8–9).

The parties agreed during oral argument that the interpretation of the 2014 Agreement in the *NuVasive* case does not apply here because the *NuVasive* dispute involved different parties and different issues. (Tr. 44:13–45:10, 61:22–62:1). Thus, I interpret the 2014 Agreement as if it were the first time I am interpreting it.

Highridge argues that the 2014 Agreement should be interpreted as an assignment because the 2014 Agreement uses the word "assigns," and only full patents, not particular claims within a patent, can be assigned. (D.I. 43 at 8–10). Dr. Jackson argues that if the Court interprets the 2014 Agreement as Dr. Jackson advocates, NuVasive is a mere license holder and Dr. Jackson remains the owner of the patents identified in the Agreement. (D.I. 49 at 15).[5]

"[D]istinguishing between 'an assignment' and a 'mere license' depends on the substance of what was granted rather than formalities or magic words." *Lone Star Silicon Innovations*, 925 F.3d at 1229 (citing *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891)). An "assignment must convey to [the recipient] the entire and unqualified monopoly which the patentee held . . . and that any assignment short of that is a mere license." *Pope Mfg. Co. v. Gormully & Jeffery Mfg. Co.*, 144 U.S. 248, 250–52 (1892); *see Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 720–21 (Fed. Cir. 2008). The relevant section of the 2014 Agreement states that "The Jackson Group hereby sells and assigns to NuVasive the entire right, title and interest to the MIS IP, Polyaxial Screw IP

---

[5] Dr. Jackson presented an additional set of arguments on this issue. (*See* D.I. 49 at 14–16). However, these arguments relied on the 2014 Agreement being incomplete. (*Id.* at 15–16). As I have determined that the 2014 Agreement is complete and there were no later executed amendments, I do not address Dr. Jackson's other set of arguments.

13

and Top Notch IP." (D.I. 44-1, Ex. A at 4). The Agreement defines "Top Notch IP" as "the horizontal tool attachment feature claimed or disclosed in U.S. Patent No. 8,377,067, U.S. Patent No. 8,162,948, U.S. Patent Application No. 11/272,508, U.S. Patent Application No. 13/815,054." (*Id.*).

The 2014 Agreement clearly states that it transferred the "the entire right, title and interest" in the Top Notch IP. (*Id.*). This language indicates the intent to create an assignment of the patents covered by the "Top Notch IP" definition. The definition of the Top Notch IP provided in the 2014 Agreement identifies the two patents and two patent applications. (*Id.*). Although the definition of Top Notch IP begins by stating that the technology is "the horizontal tool attachment feature claimed or disclosed in [the patents]" (*id.*), the Agreement does not break these patents or applications into parts or transfer only specific claims.

The Agreement involved six technologies. In section 2.01, Dr. Jackson "hereby sells and assigns" three of them ("MIS IP, Polyaxial Screw IP and Top Notch IP") to NuVasive. In section 2.02, the very next section, Dr. Jackson "grants . . . a perpetual, non-exclusive, non-transferable, non-assignable, non-sublicensable . . . and fully paid-up license . . .[in regard to] the Helical Flange[,] BOT Implants[, and] Instruments [and] Methodologies." The contrast between the two sections could not be starker, yet Dr. Jackson would interpret both sections as granting a license. (*See id.* at 4–5). In section 2.04, NuVasive grants a license back to Dr. Jackson for the MIS IP, Polyaxial Screw IP and Top Notch IP. (*Id.* at 6). There is no provision granting a license back to Dr. Jackson for the three technologies, the Helical Flange, BOT Implants, and Instruments and Methodologies, that he licensed to NuVasive. If Dr. Jackson merely granted NuVasive a license for the MIS IP, Polyaxial Screw IP and Top Notch IP, why would it be necessary for NuVasive to

14

grant Dr. Jackson a license? I think it is clear that Dr. Jackson sold and assigned the two patents and the two patent applications described in the Top Notch IP definition.

Thus, I find that the 2014 Agreement is an assignment of the '067 and '948 patents and the '508 and the '054 patent applications.

### c. The '143, '229, and '993 Patents Are Included in the 2014 Agreement

The definition of the Top Notch IP is not limited to the four named patents and patent applications. The "Top Notch IP" definition specifically includes the '067 and '948 patents and the '508 and '054 applications "and any continuations, patent applications, substitutions, amendments, extensions, reexaminations, continuations-in-part, divisions, reissues, additions and counterparts thereto." (D.I. 44-1, Ex. A at 4).

It is undisputed that the '143, '229, and '993 patents are all continuations of the '054 application. (*See* '143 pat. at p. 1; '229 pat. at pp. 1–2; '993 pat. at pp. 1–2). As the 2014 Agreement assigned the '054 application and any continuations, the Agreement assigned the '143, '229, and '993 patents. Because the assignment is an automatic assignment, as soon as the '143, '229, and '993 patents issued, the 2014 Agreement assigned them to NuVasive. *See Bd. of Trs. of the Leland Stanford Junior Univ.*, 583 F.3d at 842; *Filmtec Corp.*, 939 F.2d at 1573. Thus, the '143, '229, and '993 patents were all automatically assigned to NuVasive.

### d. Unilateral Mistake Does Not Change the 2014 Agreement

Dr. Jackson argues that the 2014 Agreement assigned the '054 application by mistake. (D.I. 49 at 11). In his briefing, Dr. Jackson does not make it clear whether he is arguing there was a unilateral or bilateral mistake. However, the evidence in the record only shows that Dr. Jackson stated that the '054 application was included by mistake (*see* D.I. 50-1, Ex. 11 at 179 of 180), and that NuVasive responded generically to a number of topics by setting up a time to discuss (*id.* at

174 or 180). There is no indication that NuVasive agreed that the '054 application was included by mistake, or even any evidence that NuVasive acknowledged Dr. Jackson's request to discuss the potential mistake. Under Missouri law, "It is well-settled that a unilateral mistake on one side, without fraud of some kind on the other side including the mistake will not be sufficient to relieve the party making the mistake and is a mistake equity will not reform." *Singleton v. Singleton*, 659 S.W.3d 336, 343 (Mo. 2023) (cleaned up). There has been no evidence presented that the '054 application was included due to any fraud. Thus, Dr. Jackson's mistake argument does not alter the 2014 Agreement.[6]

## B. Dr. Jackson Lacks Constitutional Standing

Highridge argues that Dr. Jackson has not met his burden of establishing facial standing because he has not asserted exclusionary rights in the '143, '229, and '993 patents. (D.I. 43 at 17). Highridge argues that Dr. Jackson lacks factual standing because he transferred all rights to exclude to NuVasive through the 2014 Agreement. (*Id.* at 17–20). Thus, Highridge argues, the infringement claims on the '143, '229, and '993 patents should be dismissed under Rule 12(b)(1).

### 1. Dr. Jackson has Facial Standing

To determine if a plaintiff has established facial standing, I only evaluate his complaint. *Constitution Party*, 757 F.3d at 357–58. For a plaintiff to meet the standing requirement for the court to have subject matter jurisdiction, the plaintiff must "adequately allege[] that it possesses exclusionary rights [in the patent] and that [the defendant] infringe those right." *Lone Star Silicon Innovations*, 925 F.3d at 1235; *see also Schwendimann*, 959 F.3d at 1071. Dr. Jackson's complaint

---

[6] Similarly, it does not matter whether there were later executed agreements that purported to assign the other three patents listed in the Top Notch IP definition but not the '054 application. (D.I. 49 at 13). The 2014 Agreement assigned the rights to the four patents and patent applications and their continuations; a later executed agreement that omits one of the four is not evidence of fraud and is not evidence of mistake.

16

"contain[s] such allegations—that [he] is the owner [of the patents] and [Highridge] infringed th[e] patent[s]." *Schwendimann*, 959 F.3d at 1071. Dr. Jackson's complaint asserts that he is the owner of the accused patents (D.I. 39 at 2–9), that the 2014 Agreement is a mere licensing agreement (*id.* at 9–12), and that Highridge's products infringe the accused patents (*id.* at 12–25). Thus, Highridge's attack on Dr. Jackson's facial standing fails.

### 2. Dr. Jackson Lacks Factual Standing

Highridge argues that the 2014 Agreement transferred all exclusionary rights in the three patents from Dr. Jackson to NuVasive, and therefore, Dr. Jackson does not have factual standing to sue. (D.I. 43 at 17–19). In reviewing factual standing, I may consider evidence outside of the plaintiff's complaint. *Mortensen*, 549 F.2d at 891.

The Federal Circuit "has clarified, in light of the Supreme Court's opinion in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), that [35 U.S.C.] § 281 [of the Patent Act] is not a jurisdictional requirement." *Intell. Tech.*, 101 F.4th at 814. Rather, "the touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010). As such, "constitutional standing is satisfied when a party holds at least one exclusionary right." *Univ. of S. Fla. Rsch. Found., Inc., v. Fujifilm Med. Sys. U.S.A.*, 19 F.4th 1315, 1324 (Fed. Cir. 2021).

Dr. Jackson is listed as the sole inventor and applicant on the '143, '229, and '993 patents. (*See* '143, at p. 1; '229, at p. 1; '993, at p. 1). "A patent owner has exclusionary rights as a baseline matter unless it has transferred all exclusionary rights away." *Intell. Tech.*, 101 F.4th at 816. However, as addressed above, the 2014 Agreement was an assignment of all patent rights to

17

NuVasive. The 2014 Agreement identified NuVasive as the "sole owner" of the Top Notch IP, including granting NuVasive control over patent prosecution and infringement claims. (D.I. 44-1, Ex. A at 10). Dr. Jackson has not argued that there has been any assignment of the patents back to him after the execution of the 2014 Agreement.

The 2014 Agreement provided Dr. Jackson with a "perpetual, non-exclusive, non-transferable, non-assignable, non-sublicensable, fully paid-up license under the Top Notch IP" with only the ability to license to certain third parties as specifically identified in the Agreement. (*Id.* at 6). In relation to the exclusionary rights necessary for Article III standing, the Federal Circuit has made clear that a "license only grants a licensee freedom from suit; it does not divest the licensor of its right to sue or license other parties, or to practice the patent itself." *Uniloc USA Inc. v. Motorola Mobility LLC*, 52 F.4th 1340, 1351 (Fed. Cir. 2022). Thus, based on the 2014 Agreement, NuVasive has all exclusionary rights to the '054 application and its continuations, including the '143, '229, and '993 patents. *Intell. Tech.*, 101 F.4th at 816. Without exclusionary rights, Dr. Jackson lacks factual standing to sue.[7]

Highridge's motion to dismiss the infringement claims against '143, '229, and '993 patents according to Federal Rule of Civil Procedure 12(b)(1) for lack of factual standing is granted.

## IV. CONCLUSION

An appropriate order will issue.

---

[7] Dr. Jackson has not presented any other arguments for why he would have standing to sue for infringement of the '143, '229, and '993 patents. Even if he did make alternative subject matter jurisdiction arguments, there would be serious questions on whether he has the substantial rights in the patents necessary to be granted relief under the Patent Act. While Highridge properly argued its 12(b)(6) motion to dismiss for failure to state a claim, I do not address these arguments at this time as the Court lacks subject matter jurisdiction to hear the Dr. Jackson's infringement claims on the '143, '229, and '993 patents.